# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**TAYR KILAAB AL GHASHIYAH,**
   **Plaintiff,**

  v.                 Case No. 04-C-0176

**WISCONSIN DEPARTMENT OF CORRECTIONS,**
**MATTHEW J. FRANK,**
**GARY R. McCAUGHTRY,**
**SUSAN WALLINTIN,**
**DANIEL BERTRAND,**
**and LIZ LEMERY,**
   **Defendants.**

## DECISION AND ORDER

Plaintiff Tayr Kilaab al Ghashiyah, a state prisoner at all times relevant, filed this pro se civil rights complaint pursuant to 42 U.S.C. § 1983. Before me are the parties' cross motions for summary judgment.

### I. BACKGROUND

On February 19, 2004, plaintiff filed a § 1983 complaint alleging that defendants Matthew J. Frank, Gary R. McCaughtry, Susan Wallintin, Daniel Bertrand and Liz Lemery violated his constitutional rights. By order of September 30, 2004, plaintiff was granted leave to proceed in forma pauperis on claims under the First, Fifth, Eighth and Fourteenth Amendments. Defendants' motion for summary judgment was granted as to plaintiff's First, Fifth, Eighth and Fourteenth Amendment due process claims on March 31, 2006. However, defendants' motion for summary judgment was denied with respect to plaintiff's Fourteenth Amendment equal protection claims.

Plaintiff filed a motion for judgment on these remaining claims on July 5, 2006. Defendants filed a motion for summary judgment on July 24, 2006. Both motions are fully briefed and will be addressed herein.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating that it is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. 317, 323 (1986). Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the non-moving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. Id. at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. Id. at 322-23. Neither party may rest on mere allegations or denials in the pleadings, Anderson, 477 U.S. at 248, or upon conclusory statements in affidavits, Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572 (7th Cir. 1989).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit. See 10A Charles Alan

Wright et al., Federal Practice and Procedure § 2720, at 327-28 (3d ed. 1998). The proper procedure is to assess the merits of each summary judgment motion independently. See id. at 335-37. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. Id.

### III. FACTS

**A.    Preliminary Matters**

At summary judgment, the movant's factual assertions are accepted as being true unless the opposing party submits admissible evidence contradicting such assertions. Fed. R. Civ. P. 56(e); Civil L.R. 56.1(a)(1) (E.D. Wis.). Plaintiff has disputed defendants' proposed findings of fact on grounds that they fail to comply with Civil L.R. 56.2(a). First, plaintiff contends that defendants' proposed findings of fact are not supported by any admissible evidence.[1] For example, plaintiff avers that proposed finding of fact number 3, which sets forth the employment responsibilities of Linda Alsum-O'Donovan, "is not supported by any admissible evidence." (Pl.'s Resp. to DFOF ¶ 3.) However, this proposed finding of fact properly relies on O'Donovan's affidavit (in which her duties as an Offender Records Supervisor are outlined). (See Aff. of Linda Alsum O'Donovan [O'Donovan Aff.] ¶ 3.)

---

[1]See, eg., Pl.'s Resp. to Defs.' Proposed Findings of Fact (DFOF) ¶¶ 2, 3, 4, 6, 30, 31, 38, 41 & 46.

3

Plaintiff further asserts that defendants' proposed findings of fact contain more than one factual proposition per paragraph.[2] For example, plaintiff maintains that proposed finding of fact number 29, which explains how a prisoner becomes eligible for segregation status, involves more than one factual proposition. However, Local Rule 56.2(a) does not prohibit the movant from setting forth than one factual proposition per proposed finding of fact; it merely requires such "as far as practicable." See Civil L.R. 56.2(a). Additionally, review of paragraph number 29 reveals that it does not set forth more than one factual proposition.[3]

A preliminary comment is also necessary with respect to the claims remaining in this action. This order addresses plaintiff's Equal Protection claims as described in my order of March 31, 2006. To the extent plaintiff raises additional claims in his January 24, 2007, affidavits, I will not address them at this time.[4] If plaintiff wishes to prosecute his additional claims, he may do so by filing a new civil rights complaint.

---

[2] See, e.g., Pl.s' Resp. to DFOF ¶¶ 3, 5, 6, 7, 10, 19, 20, 25, 26, 27, 29, 30, 31, 32, 33, 37, 38, 40, 41, & 46.

[3] Defendants' proposed finding of fact number 29 states, "Inmates are retained in adjustment segregation, program segregation or disciplinary segregation due to major violations of rules and regulations, which include, but are not limited to battery, sexual assault, inciting a riot and possession of drug paraphernalia."

[4] For example, in his third affidavit filed in response to defendants' motion for summary judgment, plaintiff raises religious diet, legal name and DOC programming claims. (See Third Aff. of Tayr Kilaab al Ghashiyah.)

**B.    Relevant Factual Background**

Plaintiff was incarcerated at Green Bay Correctional Institution (GBCI) at all times relevant to this action. (Aff. of Kathy Bierke [Bierke Aff.] ¶ 5.)[5] Defendant Matthew Frank is the Secretary of the Wisconsin Department of Corrections (DOC). Defendant Gary R. McCaughtry is the warden of Waupun Correctional Institution (WCI). Defendant Susan Wallintin is employed as the WCI Business Financial Program Supervisor. Defendant Daniel Bertrand is the former warden of GBCI. Defendant Liz Lemery is employed as the Correctional Management Services Director at GBCI.

**1.    Facts Relating to Photocopies**

The DOC Division of Adult Institutions loans up to $200.00 annually to indigent inmates for supplies, photocopies and postage to allow them access to the courts for litigation related to their own cases. (O'Donovan Aff. ¶ 7; Ex. 3.)[6] Inmates may ask to exceed the $200.00 legal loan limit by submitting a written request with supporting documentation directly to the warden.

Incarcerated persons who receive a legal loan may obtain copies of documents that are not self-produced, such as inmate complaints, incident reports, conduct reports, account

---

[5]Kathy Bierke is employed as an Inmate Complaint Examiner (ICE) at GBCI. (Bierke Aff. ¶ 2). In her capacity as an ICE, Bierke is the custodian of inmate complaints filed by GBCI inmates. (Bierke Aff. ¶ 4.) Additionally, Bierke has access to those records generated that pertain to GBCI inmates. (Id.)

[6]Linda Alsum-O'Donovant is employed as an Offender Records Supervisor at Waupun Correctional Institution. (O'Donovan Aff. ¶ 2.) In her capacity as an Offender Records Supervisor, O'Donovan has the duties and responsibilities of preparation of computations and related functions, coordination with law enforcement and other agencies for the return of prisoners to their respective counties and states for prosecution, coordination of information on inmates in compliance with the Wisconsin Administrative Code, and preparing files and completing forms for inmates received. (O'Donovan Aff. ¶ 3.)

5

summaries, institution handbooks, policies and procedures, codes, statutes and other materials. However, the legal loan may not be used to obtain photocopies of self-generated documents, such as briefs, letters and affidavits because these items may be re-produced by hand. In contrast, inmates that are not on legal loan and have their own accounts may use their own money to make copies of self-generated legal materials.

### 2. Facts Relating to Embossed Envelopes

On November 24, 2003, while plaintiff was in segregation, twenty envelopes embossed with $.37 stamps sent to him from the U.S. Postal Service were received in the GBCI mail room. Mailroom staff denied delivery of the envelopes and issued a Notice of Non-Delivery of Mail to plaintiff, stating that the envelopes were not an approved item for an inmate housed in the segregation unit.

Pursuant to the GBCI Segregation Handbook, segregation inmates must purchase embossed envelopes from the canteen only and may not receive embossed envelopes through the mail. (Bierke Aff. ¶ 10.) In contrast, inmates in general population are permitted to obtain embossed envelopes from the post office. Thus, in November 2003, the major difference relating to possession of embossed envelopes was that segregation inmates had to purchase embossed envelopes from the canteen whereas general population inmates could purchase them from the canteen or get them directly from the post office.

Inmates are retained in adjustment segregation status, program segregation or disciplinary separation due to major violations of rules and regulations. (Aff. of William D. Swiekatowski [Swiekatowski Aff.] ¶ 7.)[7] Segregation inmates generally exhibit behavior that

---

[7]William D. Swiekatowski has been employed by the DOC since August, 1991. (Swiekatowski Aff. ¶ 7.) He is currently a segregation lieutenant at GBCI. Id. As a

6

is continually disruptive, dangerous or threatening to the orderly operation of the prison. The segregation process is designed to encourage positive adjustment while in segregation and provide an opportunity for an inmate to successfully return to the institution's general population. The goal is to provide a controlled increase in privileges and responsibilities in order to promote acceptable behavior.

General population inmates can earn privileges based on behavior, conduct and compliance with prison rules and policies. Inmates in general population with no restrictions are allowed the maximum property, recreation, visits, and telephone calls. Inmates in general population may be eligible for work and he paid wages and they are allowed certain privileges, such as meals in the dining room, work assignments and school.

## IV. DISCUSSION

Plaintiff asserts two equal protection claims. First, he alleges that defendants discriminated against indigent inmates when they prohibited indigent inmates from photocopying self-generated materials, while inmates who are not on legal loan are not similarly restricted. Second, plaintiff claims that defendants' policy of requiring inmates in segregation to purchase embossed envelopes from the canteen, while allowing inmates in the general population to obtain such items from the canteen or the post office, is a violation of his equal protection rights.

In response, defendants contend that they are entitled to summary judgment on the following grounds: (1) plaintiff is not similarly situated to inmates with funds or inmates in

---

segregation lieutenant, Swiekatowski's duties include supervising officers in the segregation unit, conducting investigations and disciplinary hearings and ensuring and maintaining the security and safety of all staff and inmates at GBCI. (Id.) Prior to working in segregation, Swiekatowski worked primarily in general population. (Id.)

7

general population; (2) defendants' policies regarding photocopies and embossed envelopes are rationally related to legitimate state interests; and (3) defendants are immune from liability under the doctrine of qualified immunity.

To comply with equal protection, governmental entities are generally required to treat all similarly situated persons in a similar manner. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). In analyzing an equal protection claim, I must first determine whether the claim involves a suspect class or a fundamental right. Pryor v. Brennan, 914 F.2d 921, 923 (7th Cir. 1990). Here, plaintiff does not assert that he is a member of a suspect class, but rather that defendants' policy irrationally discriminates against him as an indigent inmate. Therefore, the rational basis test is appropriate. Cleburne, 473 U.S. at 440.

Where the circumstances do not involve a suspect classification such as race or gender, an inmate who challenges a particular prison practice or regulation must show or indicate that the regulation is not reasonably related to a legitimate governmental concern, or must demonstrate that the challenged regulation or practice is an exaggerated response to those concerns. See Caldwell v. Miller, 790 F.2d 589, 590 (7th Cir. 1986). A prison regulation that treats inmates unequally will be upheld if it is reasonable in light of legitimate penological interests. May v. Sheahan, 226 F.3d 876, 882 (7th Cir. 2000). However, while prison officials are to be accorded deference with respect to the administration of prison affairs, and a mere inconsistency in the treatment of some prisoners is not sufficient to state an equal protection claim, when a plaintiff asserts that the defendants discriminated against him as a member of a group in favor of others similarly situated, the state must come forward with a legitimate governmental interest. Durso v. Rowe, 579 F.2d 1365, 1379 (7th

8

Cir. 1978). Upon such a showing, the plaintiff then has the burden of demonstrating that the regulation at issue is not rationally related to any of the legitimate interests presented by the state. Id.

### A. GBCI's Policy Regarding Photocopies

Plaintiff avers that GBCI's policy of denying indigent inmates photocopies of handwritten materials, while inmates with funds are permitted to obtain photocopies of the same, violates his equal protection rights. In response, defendants aver that: (1) plaintiff, as an indigent inmate is not similarly situated to inmates with funds; and (2) GBCI's photocopy policy is rationally related to a legitimate state interest.

First, defendants submit that plaintiff has failed to demonstrate that he is similarly situated to inmates with funds. To prevail on an equal protection claim, plaintiff must prove that defendants intentionally treated him differently from others similarly situated. United States v. Hook, 471 F.3d 766, 774 (7th Cir. 2006) (citing Smith v. City of Chicago, 457 F.3d 643, 650-51 (7th Cir. 2006). "There is no precise formula to determine whether an individual is similarly situated to comparators." Maulding Development v. City of Springfield, 453 F.3d 967, 968 (7th Cir. 2006). Further, "[I]t is not the case . . . that any difference in the nature of a detainee's confinement [automatically] justifies different treatment. Sometimes detainees in different sorts of confinement are similarly situated for the purposes of the challenged policy." May, 226 F.3d at 882.

In the present case, plaintiff does not dispute that he is not similarly situated to inmates with funds. However, I believe that a brief discussion of the differences between indigent inmates and inmates with funds is necessary in the interest of thoroughness. As an indigent prisoner, plaintiff may obtain up to $200.00 to use for supplies, photocopies and

9

postage to allow him access to the courts. However, the legal loan is subject to several restrictions. Significantly, legal loan funds may not be used for making photocopies of self-generated legal documents such as hand-written briefs, affidavits and letters because these documents are capable of being duplicated by hand. On the other hand, inmates who are not on legal loan and have their own accounts are not similarly restricted and may use their own money to make copies of self-generated legal documents. In light of the foregoing, I cannot conclude that plaintiff has met his burden of showing that he is similarly situated to general population inmates. However, plaintiff's photocopy claim should be dismissed for additional reasons.

Plaintiff avers that defendants have not advanced any legitimate reasons for the existence of the photocopy policy. To determine whether a rule is reasonable in light of penological objectives, courts should consider:

> 1. whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule;
>
> 2. whether there are alternative means of exercising the right in question that remain available to prisoners;
>
> 3. the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and
>
> 4. although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable.

Al-Alamin v. Gramley, 926 F.2d 680, 685 (7th Cir. 1991) (quoting Williams v. Lane, 851 F.2d 867, 877 (7th Cir. 1988) (internal quotation marks omitted)). A prison regulation cannot be sustained when the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary and irrational. Williams, 851 F.2d at 877.

10

In the present case, defendants claim that their photocopy policy is reasonable inasmuch as running a cost effective prison is a legitimate penological interest. In <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348; 352-53 (1987), the Supreme Court held that cost is one factor that may weigh in favor of finding that a challenged policy is reasonable. And, in <u>Al-Alamin</u>, 926 F.2d at 685, the Court of Appeals for the Seventh Circuit held that economic concerns are legitimate penological demands. Further, it appears that there are alternative means of obtaining copies of self-generated materials because indigent inmates may copy such documents by hand. <u>See</u> <u>id.</u> "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of 'the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987) (internal citations omitted). For these reasons, defendants' motion for summary judgment will be granted with respect to this claim.

**B.     GBCI's Policy Regarding Embossed Envelopes**

Plaintiff next claims that GBCI's policy requiring inmates in segregation to purchase embossed envelopes from the canteen, while general population inmates are permitted to obtain the same from either the post office or the canteen, violates his equal protection rights.

Defendants assert that inmates in segregation necessarily are not similarly situated to inmates in the general prison population for purposes of the envelope policy. However, as noted, "[I]t is not the case . . . that any difference in the nature of a detainee's confinement [automatically] justifies different treatment. Sometimes detainees in different sorts of confinement are similarly situated for the purposes of the challenged policy." <u>May</u>, 226 F.3d at 882. "While the reasons that a prisoner is in a specific type of confinement may

11

be relevant to an equal protection analysis, it is not determinative. Rather, courts must focus on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action." Hosna v. Groose, 80 F.3d 298, 305 (8th Cir. 1996) (internal citations and quotations omitted).

In 2001, the prison prohibited all inmates from obtaining embossed envelopes from sources other than the canteen. However, on February 10, 2003 GBCI Warden Bertrand issued a memorandum authorizing inmates in the general population to receive embossed envelopes from family and friends, in addition to purchasing such envelopes from the canteen. Subsequently, apparently concerned with the direct handling of envelopes by family and friends, Warden Bertrand amended the policy on April 20, 2003, to state that embossed envelopes may only be sent to general population inmates directly from the United States Post Office. Inmates in segregation status never have been prohibited from possessing embossed envelopes, but merely from receiving them from any source outside of canteen purchase.

There are differences between these two prisoner groups. Inmates retained in adjustment segregation status, program segregation or disciplinary separation have been found guilty of violations of prisons rules or regulations. As a result, segregation inmates are stripped of many privileges and are subject to personal property restrictions. However, plaintiff first asserts that the blind distinction defendants draw between general population and segregation inmates is not in accord with their policies.[8] He asserts that the prison system maintains six security classification assigned pursuant to Wis. Admin. Code §§ DOC

---

[8]It is notable that plaintiff's segregation is not temporary in nature; rather plaintiff estimates that he has been in segregation for approximately twelve years at present.

12

302.12 and 302.19, and that his segregation status is more properly termed administrative segregation. Further, he asserts that with respect to his security classification for purposes of the envelope policy, he is similarly situated to general population inmates because he may participate in any program that does not require him to leave his cell, and may keep legal, educational, reading and writing materials, including 25 embossed envelopes, stamps, and receive personal and legal letters. While the record does not reflect the number of envelopes general population prisoners may keep in their cells, given that both groups of inmates may possess embossed envelopes and receive and posses mail delivered from outside the prison, I conclude that plaintiff is similarly situated for purposes of the envelope policy.

Unequal treatment among similarly situated inmates "however, is justified if it bears a rational relation to legitimate penal interest." Williams v. Lane, 851 F.2d 867, 881 (7th Cir. 1988) (citing Hudson v. Palmer, 468 U.S. 517, 522-523 (1984)). It is well established that institutional security is a legitimate state interest. See French v. Owens, 777 F.2d 1250 (7th Cir.1985). However, the defendant must establish the necessary relationship between prison security and the challenged disparate treatment. Williams, 851 F.2d at 881. Plaintiff claims that defendants have not presented any legitimate state interest to justify their policy prohibiting segregation inmates from obtaining embossed envelopes from the U.S. Post Office. In response, defendants submit that GBCI's embossed envelope policy is rationally related to their legitimate state interest in maintaining institutional security.

Defendants first argue that the embossed envelope policy is rationally related to a legitimate state interest in institutional security because it controls the amount of paper that segregation inmates are permitted to have in their cells, thereby reducing the possibility that

13

the envelopes will be used to clog toilets and obstruct cell windows. Segregation inmates are allowed to posses 25 embossed envelopes from the canteen. Plaintiff responds that prohibiting segregation inmates from obtaining embossed envelopes from the U.S. Post Office is not logically connected to defendants' asserted goal. I agree. The source of an embossed envelope would not affect its toilet-clogging or window-covering propensities. Rather, limiting the number of envelopes (which defendants have done) from <u>any</u> source would further that goal. Thus, defendants' action is not rationally related to its stated goal.

Next, defendants assert that allowing outside vendors to provide postage-paid envelopes to segregation inmates implicates institutional security because visually undetectable drugs can be impregnated onto the adhesive of the stamps and envelopes. However, this policy is not legitimately related to defendants' policy for two reasons. First, this threat would be just as great for persons in the general prison population as with segregation prisons. Further, to the extent that the nature of a prisoner in segregation exacerbates this potential, I note that persons in segregation may receive mail from outside sources, which presumably carries the same degree of potential for impregnation of undetectable drugs. Further, to the extent that a mailing of many envelopes together carries a greater threat of concentration of an illegal substance, the envelopes would be sent directly to the prison from the U.S. Postal Service and would not be handled by an inmate's friends or family. Finally, although defendants assert that there are alternative means of obtaining embossed envelopes insofar as plaintiff may purchase these items from the canteen, <u>see</u> <u>Al-Alamin</u>, 926 F.2d at 685, I conclude that this is insufficient. Plaintiff asserts that as he is without funds in his institutional accounts, he is reliant on outside sources to obtain such envelopes. Thus, for these reasons, I conclude that while defendant may have

14

a legitimate state interest in institutional security, such interest is not rationally or reasonably related to defendants' policy of preventing inmates housed in segregation from receiving embossed envelopes sent to the prison by the U. S. Postal Service while similarly allowing inmates in the general population to receive such envelopes.

Accordingly, I will grant defendants' motion for summary judgment on plaintiff's photocopy claim but deny their motion for summary judgment on plaintiff's embossed envelope claim.

**C.     Qualified Immunity**

Defendants contend that, even if plaintiff is successful on his claims, he should be precluded from recovering damages because they are entitled to qualified immunity. Qualified immunity will shield defendants "from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The threshold inquiry a court must undertake in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201(2001).

When a constitutional violation is "made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the [constitutional] right was clearly established," an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. As the Seventh Circuit has explained:

> The words "clearly established . . . constitutional rights" may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms. . . . The right

15

> must be sufficiently particularized to put potential defendants on notice that
> their conduct probably is unlawful.

Rice v. Burks, 999 F.2d 1172, 1174 (7th Cir. 1993). If the law did not put the officer on notice that his conduct was clearly unlawful, summary judgment with respect to claims for damages based on qualified immunity is appropriate. Saucier, 533 U.S. at 202. This is so because qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). The plaintiff who bears the burden of establishing the existence of the allegedly clearly established constitutional right. Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988).

In the present case, plaintiff has not met his burden of demonstrating that the right was clearly established. He points to no closely analogous cases, and given the peculiar nature of the challenged policy and the deferential manner in which courts review prison policies, I cannot conclude that the state of the law was such that defendants should have known that they were violating plaintiff's rights by enforcing the rule.

While the Seventh Circuit has established that differences in treatment among inmates in different confinement situations, without a legitimate reason, will support an equal protection claim, Williams, 851 F.2d at 881, that holding is far too general to support the particularized, clear finding required for qualified immunity. Williams involved differences among inmates between programming and living conditions, while the present matter concerns inmate mail. Thus, while I concluded that defendant's security concerns were not reasonably related to the embossed envelope policy for purposes of discriminating between general population and segregation inmates, I cannot conclude that such right was clearly

16

established. Thus, I will grant defendants' motion on the basis of qualified immunity on plaintiff's embossed envelope claims.

**D.    Mootness**

As a final note, with respect to plaintiff's remaining claims for injunctive relief, my review of another case filed by plaintiff reveals that he has been transferred to Boscobel Correctional Institution, although no such change of address was filed in the present matter. A plaintiff's transfer from the facility against which he requests injunctive or declaratory relief generally moots such relief. Pearson v. Welborn, 471 F.3d 732, 743 (7th Cir. 2006). Thus, I request that the parties brief the issue of the effect of plaintiff's transfer on his claims for injunctive relief.

## V.  CONCLUSION

**For the foregoing reasons,**

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment (Doc. # 70) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that plaintiff's motion for judgment (Docket #67) is **GRANTED IN PART AND DENIED IN PART**.

Dated at Milwaukee, Wisconsin, this 30th day of March, 2007.

/s Lynn Adelman

LYNN ADELMAN
District Judge